ALLIED-SIGNAL, INC., AS SUCCESSOR BY MERGER TO ALLIED CORPORATION (FORMERLY ALLIED CHEMICAL CORPORATION), Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Allied-Signal v. Commissioner
Docket Nos. 9662-89, 17584-89.
United States Tax Court
T.C. Memo 1992-204; 1992 Tax Ct. Memo LEXIS 241; 63 T.C.M. (CCH) 2672; April 6, 1992, Filed *241 Decisions will be entered under Rule 155. Richard G. Fishman, James G. Wells, Ronald A. Sinaikin, Mac Asbill, Jr., Padric K. J. O'Brien, and Jerome B. Libin, for petitioner. Janet Engel Kidd, for respondent. PARKER
PARKER
MEMORANDUM FINDINGS OF FACT AND OPINION PARKER, Judge: Respondent determined the following deficiencies in petitioner's Federal corporate income taxes: Taxable Year
Deficiency
1977
$ 5,502,323
1978
1,209,012
1979
2,057,638
1980
12,410,794
1981
15,344,747
1982
363,759
Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the taxable years at issue, and all Rule references are to the Tax Court Rules of Practice and Procedure. The parties filed a Stipulation of Settled Issues on November 6, 1990. After concessions, the issues for decision are: (1) Whether petitioner's payment of $ 8,000,000 in 1977 to the Virginia Environmental Endowment Fund is deductible under section 162(a) as an ordinary and necessary business expense or whether such payment is a "fine or similar penalty", the deductibility of which is proscribed by section *242 162(f); (2) Whether the legal expenses incurred by petitioner in connection with the organization of and contribution to the Virginia Environmental Endowment Fund are deductible under section 162(a) or nondeductible under section 162(f). FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulation of facts and the exhibits attached thereto are incorporated herein by this reference. Petitioner, Allied-Signal, Inc., successor-in-interest by merger to Allied Corporation, is a Delaware corporation with its principal place of business in Morristown, New Jersey. Allied Corporation, formerly known as Allied Chemical Corporation, was a New York corporation. Petitioner was an accrual method, calendar year taxpayer for the years at issue. Throughout all relevant periods, petitioner was engaged in the research, development, manufacture, and sale of agricultural and industrial chemicals. During the late 1940s and early 1950s, Allied Chemical developed a highly toxic chemical pesticide known as Kepone. Allied Chemical marketed Kepone primarily in Europe as an insecticide in potato farming. It also sold a small percentage of Kepone in Central America for *243 use in banana groves and in the United States for use in ant traps. During its research, development, and manufacture of Kepone, petitioner prepared operating instructions for internal use and submitted studies to the United States Department of Agriculture regarding Kepone and its effects. The operating instructions established and warned that Kepone is toxic and that, in order to maintain safe working conditions, its manufacture and use must be carried out under specific controlled circumstances. In January 1976, the National Cancer Institute released a report implicating Kepone as a possible carcinogen in humans. From the late 1950s through July 1975, petitioner, or other companies on behalf of petitioner, commercially manufactured Kepone. Initially, the manufacture of Kepone took place outside of Virginia. In 1966, however, petitioner reassigned this manufacturing operation to a small operating facility, known as a "semi-works", within its manufacturing complex in Hopewell, Virginia, about 20 miles south of Richmond. Petitioner employed approximately 1,200 people in Hopewell, which at that time advertised itself as "The Chemical Capital of the South". Petitioner primarily *244 produced three compounds at the Hopewell semi-works: Kepone; THEIC, a biologically inactive chemical used in commercial wire manufacture; and TAIC, a biologically inactive derivative of THEIC used for similar purposes. During the normal course of its business, petitioner discharged wastes from the manufacture of these chemicals into fresh water tributaries of the James River, a principal Virginia waterway that empties into the Chesapeake Bay. The discharge of chemical wastes into these waters was regulated by Federal, state, and local law. Between the late 1950s and July 1975, other companies also manufactured Kepone for petitioner under "tolling contracts", a common arrangement in the chemical and oil industries. During 1972 and 1973, petitioner had transferred the operations and personnel of its division responsible for Kepone from Hopewell to Houston, Texas. Under these tolling contracts, one company processes raw materials supplied by another company (here, Allied Chemical), receiving a "tolling" fee for each unit produced. The supplying company (here, Allied Chemical) retains title to the raw materials and sells the processed chemical compound to its customers after it *245 performs any further processing and packaging. Life Science Products Company (Life Science) was one such processing company. Life Science was a corporation owned by two former employees of petitioner, William Moore (Moore) and Virgil Hundtofte (Hundtofte), both of whom were experienced in the production of Kepone. Moore had been the director of research in the agricultural division of Allied Chemical. Hundtofte had been the manager of the Allied Chemical facility in Hopewell. Moore held a patent with respect to the manufacture of Kepone. On November 30, 1973, petitioner and Life Science entered into a tolling contract whereby Life Science would manufacture Kepone for petitioner. Petitioner provided Life Science with copies of its Kepone manuals and guidebooks, which had been authored by or for Moore when he was employed by petitioner, as well as detailed internal documentation developed in connection with petitioner's research and manufacture of Kepone. Petitioner also supplied Life Science with warning labels for Kepone containers. The labels warned that Kepone "may be fatal if swallowed, inhaled or absorbed through skin" and cautioned users to wash thoroughly after handling *246 and not to breathe Kepone dust or vapor. In March 1974, Life Science began manufacturing Kepone for petitioner, using a converted facility in Hopewell as its processing plant. In July 1975, after being alerted to Kepone poisoning of many Life Science employees and members of their families, officials from the Virginia State Department of Health ordered Life Science to cease operations, resulting in the closing of the Hopewell plant. The Kepone poisoning occurred because Life Science either failed to follow or ignored safety precautions in Kepone manufacture. Life Science became insolvent when the Hopewell plant was closed. Life Science was financially incapable of remedying the consequences of the Kepone incident. As many as 62 current and former Life Science employees suffered from Kepone poisoning. The operations of Life Science resulted in Kepone contamination of the atmosphere, soil, and waterways. The United States Environmental Protection Agency (EPA) reported Kepone particulate in the atmosphere as far away as Richmond. The EPA reported Kepone contamination of the Life Science plant and a neighboring building, the soil at the plant site, a section of the Hopewell landfill, *247 and a lagoon adjacent to the Hopewell waste treatment facility. The EPA also reported that the James River and its local tributaries had unacceptable levels of Kepone, as did shellfish and finfish taken from the river. In December 1975, in response to these reports, Virginia Governor Mills E. Godwin issued an emergency order closing the James River and portions of the Chesapeake Bay to commercial fishing. The local and national press laid the blame for the Kepone incident on petitioner. Some news reports and editorials charged that Life Science had been used by petitioner as a front for Kepone manufacture, while others ignored Life Science's role altogether, laying full responsibility upon petitioner. On December 14, 1975, the CBS program "60 Minutes" sharply criticized petitioner for the Kepone incident. In an early attempt to address the unfavorable publicity that petitioner had suffered as a result of its involvement in the Kepone incident, petitioner decided to implement an advertising campaign that would portray it as a good and concerned corporate citizen. However, because of persistent negative stories on petitioner's alleged role in the Kepone incident which dominated *248 the media, as well as the prospect of significant litigation, petitioner decided to postpone implementation of the advertising campaign. Petitioner's board of directors maintained a high level of interest in senior management's responses to the Kepone incident and to the negative publicity and litigation that petitioner faced. At its February 1976 meeting, the board was informed that petitioner's outside auditors had identified the Kepone incident as having a potentially significant impact on petitioner's financial statements. The auditors' opinion with respect to petitioner's financial statements for 1976 was "qualified" because of the inability to predict what additional costs from pending lawsuits and other exposure petitioner would incur as a result of the Kepone incident. Petitioner's bond rating, however, was not downgraded and, at the time of the trial, John T. Connor (Connor), chairman of the board and chief executive officer of petitioner, could not recall to what degree the Kepone incident had affected petitioner's stock prices. On January 22, 23, 26, and 29, 1976, the Senate Subcommittee on Agricultural Research and General Legislation of the Committee on Agriculture *249 and Forestry conducted hearings in Washington, D.C., on the Kepone problems at Hopewell. Among the witnesses at those hearings were Governor Godwin; Russell Train, head of the EPA; representatives of various other Virginia agencies; employees of petitioner; and employees of Life Science. The hearings explored the relationship between petitioner and Life Science. Certain senators and witnesses suggested that petitioner had not imparted to Life Science adequate information on the toxicity of Kepone, and that petitioner bore responsibility for the contamination at the Life Science plant. The Subcommittee on Manpower Compensation and Health and Safety of the House Committee on Education and Labor held similar hearings on January 30, February 9, and March 18, 22, 24, and 25, 1976. As a result of the Kepone incident, hundreds of personal injury and other damage claims were filed against petitioner. These claims could have substantially affected petitioner's ability to continue operating as a viable going concern. Approximately 10,500 persons alleging to have been harmed by the Kepone incident sought to recover damages in excess of $ 25 billion from petitioner. Claims by Life Science *250 employees, their families, and others aggregated approximately $ 85 million. Approximately 400 fishermen, alleging that their livelihood was impaired by the closing of the James River and Chesapeake Bay, filed claims against petitioner aggregating $ 24 million. In addition, a class action suit was brought against petitioner on behalf of some 10,000 fishermen and other members of the Bay-area seafood industry, claiming damages of $ 25 billion. The Virginia Water Control Board brought suit against petitioner for $ 3.5 million in civil penalties. Petitioner was also informed that the Commonwealth of Virginia, the City of Hopewell, the EPA, the Army Corps of Engineers, and other governmental agencies involved in the investigation of the Kepone incident and its subsequent cleanup would demand reimbursement from petitioner for expenses incurred or expected to be incurred in the cleanup. In the aggregate, these cleanup expenses could have exceeded $ 20 million. On September 25, 1975, at the first meeting of petitioner's board of directors held after Life Science was closed, Brian D. Forrow (Forrow), petitioner's general counsel, vice president, and a board member, reported on the Kepone *251 incident. Around the same time, and at the request of Virginia officials, petitioner voluntarily decontaminated the Life Science plant and 33 railway cars of water found at the plant site. With the approval of government agencies, including the EPA, petitioner also buried contaminated materials found at or near the plant site. Petitioner spent approximately $ 800,000 on these cleanup efforts. During the latter half of 1975, petitioner agreed with the EPA and the State of Maryland to decontaminate and demolish a processing and shipping facility in Baltimore, Maryland, which had been used to package Kepone for export, and to arrange for health tests for the employees working at that facility. Petitioner incurred significant costs in these efforts. Petitioner and its outside experts conducted intensive research on methods of retrieving Kepone from the James River and on the effects of incineration of Kepone waste. Scientists at petitioner's central research laboratory worked closely with Virginia and Federal authorities to improve procedures for identification of Kepone in the environment. At this time, petitioner waived in perpetuity its right to manufacture Kepone within the *252 United States. In January 1976, petitioner considered what steps it should take to counteract the negative publicity generated by the Kepone incident. A memorandum from a public relations consulting firm stated that "Perceptions of the problem by groups of influentials important to the Company are being firmly developed, and in most cases these are based on the emotionalism of the situation rather than on fact." That public relations firm suggested that Allied Chemical set up a Kepone task force to coordinate all Kepone action. The firm also noted the possibility of setting up a citizens committee, headed by the president of a local bank, to determine what the Kepone victims needed. In January 1976, Connor met with Governor Godwin. Connor pledged that, although petitioner did not feel it was responsible for the problems brought about by Life Science, petitioner would "do the right thing" with respect to the Kepone incident. Petitioner sponsored health tests for its employees and residents of Hopewell. It also donated approximately $ 88,000 to the Medical College of Virginia, which monitored and treated several former Life Science employees who had been affected by Kepone. *253 As a result of these studies, the College's medical team confirmed the effectiveness of a certain treatment for accelerating elimination of Kepone from the human body, thereby speeding the recovery of those persons who had suffered from Kepone poisoning. In early 1976, the United States Attorney for the Richmond, Virginia, area empaneled a grand jury to consider whether Federal criminal charges should be brought against petitioner, its past and present employees, Moore, Hundtofte, Life Science, and the City of Hopewell for actions relating to the Kepone incident. On May 7, 1976, the grand jury returned an indictment (the first indictment) against petitioner and others on 940 counts of unlawful discharges of Kepone, THEIC, and TAIC wastes by petitioner at its Hopewell complex between 1971 and 1974. The first indictment was based on the discovery that petitioner's applications for governmental permits to discharge manufacturing wastes into Hopewell's tributaries were inaccurate in that they failed to list the Kepone, THEIC, and TAIC discharges. Each of the 940 counts represented a single day's discharge; 628 counts were for THEIC and TAIC, 87 counts for TAIC and Kepone, and the remaining *254 225 counts for Kepone alone. The first indictment also contained an additional related charge of conspiracy to interfere with United States Government agencies in connection with applications for discharge permits. On May 7, 1976, the grand jury also returned a second indictment against petitioner and others, alleging in part that petitioner had aided and abetted Life Science in the unlawful discharges of Kepone waste from the Life Science plant from March 1974 through September 1974 and on certain days during June and July 1975. On August 2, 1976, the grand jury returned a third indictment against petitioner and others, alleging in part that petitioner had conspired with Life Science in the unlawful discharges of Kepone waste from the Life Science plant from January 1973 to August 1976. In August 1976, petitioner was arraigned on the counts contained in all three indictments. Throughout the criminal litigation, petitioner was represented by Joseph M. Spivey III (Spivey) and Murray J. Janus (Janus). Petitioner pled not guilty as to all of the counts in all three indictments. Trial was scheduled to take place in Richmond before Judge Robert R. Merhige, Jr. (hereinafter the trial *255 judge or the sentencing judge), in the United States District Court for the Eastern District of Virginia. Petitioner and its counsel explored the possibility of settlement as to the charges in the first and second indictments, but those settlement negotiations ultimately proved fruitless. On June 24, 1976, petitioner's board of directors authorized certain of its officers to settle the pending criminal suits. As a basis for settlement, the board contemplated that petitioner would plead nolo contendere on all counts in the first indictment and pay a maximum fine of $ 1,400,000, "except that with the approval of the Executive Committee such maximum fine could be increased to $ 2,000,000." On August 19, 1976, petitioner, with respect to the first indictment, changed its plea of not guilty to one of nolo contendere as to all 940 counts in the first indictment for illegal discharge of wastes. [1] The trial judge accepted this change of plea over the objections of the United States Attorney, William B. Cummings (Cummings). Petitioner's counsel stated that he was "satisfied that there would be a factual basis of proof for each of the counts * * *." Petitioner's nolo contendere plea was *256 not made pursuant to a plea bargain, settlement, or other compromise arrangement with the United States Attorney or other representatives of the United States Department of Justice. At this change of plea hearing, the trial judge expressed his hope that the criminal fine could be allocated to the Commonwealth of Virginia: THE COURT: Mr. Cummings, the thought runs through my mind -- and the thought just occurred to me -- it might not even be worth pursuing, but I would ask you to research it and see what discretion, if any, the Court has. I have serious doubt that I have any. There are certain types of cases in which fines and contempts and things of that nature can't be -- monies can be allocated to the injured parties. I would want you to look into that. MR. CUMMINGS: I will look into it. THE COURT: I want to know if any of this fine that will be forthcoming can be allocated to the State of Virginia.
Trial on the second and third indictments *257 was set for September 27, 1976, and sentencing on the first indictment was set for October 5, 1976. On September 30, 1976, after a bench trial before the same judge, petitioner was acquitted on all counts of the second and third indictments. In September 1976, petitioner became aware of significant cash contributions for research purposes made by General Electric Company in settlement of claims brought by the State of New York over that company's discharge of PCBs into the Hudson River. This information was transmitted to Messrs. Lloyd Cutler (Cutler) and John Pickering (Pickering) of the law firm of Wilmer, Cutler & Pickering, petitioner's Washington, D.C., counsel. Connor had retained Wilmer, Cutler & Pickering in September 1975 to help reestablish the corporate image of petitioner, to represent petitioner at congressional hearings, and to deal with other matters arising out of the Kepone incident. At the September 30, 1976, Allied Chemical board meeting, Connor proposed that the company undertake further voluntary actions to demonstrate its concern for the damage caused by Kepone and to aid in the resolution of present and potential claims against the corporation. Upon Connor's *258 recommendation, the board authorized the executive committee to approve expenditures, over and above what had already been spent, of up to $ 10,000,000 to fund such actions. At this time, petitioner considered the tax-planning impact of its proposed actions. On October 4, 1976, G. W. Monck (Monck), petitioner's associate director of taxes, sent a letter to V. Futter (Futter), associate general counsel, concerning the nondeductibility of fines and penalties and the possible deductibility of a voluntary payment. In this letter, Monck advised Futter that "For the payment to be considered deductible, it is recommended that the court record be clear that the payment is being made voluntarily and not under the compulsion of a suspended sentence, for example." Monck suggested that petitioner try to defer imposition of sentence and in the meantime pledge a specific amount of money to be used for Kepone cleanup and then use this action as a mitigating factor in support of a smaller penalty. On October 5, 1976, the sentencing judge conducted an evidentiary hearing regarding the sentence to be imposed with respect to the 940 counts to which petitioner had pled nolo contendere. After stating *259 that he was taking into account numerous factors, the judge sentenced petitioner to pay the maximum fine on all counts -- $ 2,500 per count for counts 1 through 456 and $ 25,000 per count for counts 457 through 940 -- for a total fine of $ 13,240,000. The sentencing judge stated that he was "satisfied that [petitioner] would have been found guilty, or they wouldn't have pled nolo" and that "Allied knew it was polluting the waters." In addition to punishing petitioner, the sentencing judge wanted to send a message to other corporations. He stated "I hope after this sentence, that every corporate official, every corporate employee that has any reason to think that pollution is going on, will think, 'If I don't do something about it now, I am apt to be out of a job tomorrow.' I want the officials to be concerned when they see it." The sentencing judge reiterated his wish that the fines could be used to benefit directly the people of Virginia who were hurt by petitioner's actions, but he was "satisfied * * * that this cannot be done under the law." He ordered petitioner to satisfy payment of the fine in 90 days, but indicated that he would entertain a Rule 35[2] motion at the end of *260 the 90 days. He stated further: Now, so there be no misunderstanding, this is not a suggestion that the Court will reduce the fines. I intend to and will consider what actions, if any, have been voluntarily taken by the defendant corporation to alleviate the horrendous effects that have occurred. In no event, do I want any actions done under any compulsion whatsoever. Any action it would take should be taken voluntarily. In no event would a reduction, if there is a reduction, be in an amount equal to whatever they may voluntarily expend. I am not, however, closing my mind to consideration of an appropriate adjustment.
The sentencing judge hoped that such remedial action would benefit persons within Virginia, provided that such actions were not in settlement or other reduction of petitioner's present or future liability for damages. He stated further that the 90-day period was not a probationary period and that he could not and would not require petitioner to take any actions as a condition of probation. *261 By the latter part of 1976, Alexander B. Trowbridge (Trowbridge) was vice chairman of petitioner and had assumed day-to-day responsibility for shaping and communicating petitioner's responses to the Kepone incident, subject to the direction of Connor and the approval of petitioner's board. The national press continued to criticize petitioner for its role in the Kepone incident, referring to petitioner as a "poisoner firm" and a "corporate mugger". After the criminal trials, petitioner undertook the previously set aside advertising campaign that would portray petitioner as a good and concerned corporate citizen. In a memorandum dated October 13, 1976, Wilmer, Cutler & Pickering again provided petitioner with its recommendations for voluntary remedial actions, including the creation of, and initial contribution of $ 5,000,000 to, a foundation or trust to engage in research for the purpose of developing methods to eradicate Kepone from the environment. The memorandum advised that the creation of the trust "should serve to achieve a substantial mitigation of the fine." It did, however, caution that It does not seem practicable to seek and obtain quid pro quo, in the sense *262 of an agreed bargain, within the 90-day period [the sentencing judge] has specified. Of course, no bargain can be struck with the Judge himself in the sense of a reduction in the fine that would be agreed when Allied takes its action.
Petitioner considered a variety of proposals for voluntary actions that it could appropriately take, including the proposal advanced by Wilmer, Cutler & Pickering. On October 18, 1976, Futter sent a memorandum to Trowbridge and Forrow, with suggestions on the best approach to the Kepone matter. Futter cautioned that the creation of a nonprofit tax-exempt foundation or trust to remedy the environmental effects of Kepone may subject petitioner to a shareholders' suit for waste of corporate assets. However, "If the results of our voluntary actions, taken after the payment of the fine, is that [the sentencing judge] orders a reduction in the fine equal, for example, to 75% of the amount paid, then the defense of any such suit would be that the payments have resulted in a net benefit to the Corporation * * *." On October 27, 1976, Trowbridge sent a memorandum to Connor concerning reduction of the fine and stated, "Probably entail total dollar outlay *263 larger than the actual fine ($ 10,000,000 plus a reduced fine of perhaps $ 5,200,000) but which might have an after tax impact on us of less than the original $ 13.2 million." In considering the proposals to make voluntary payments, petitioner requested from the law firm of Cravath, Swaine & Moore (Cravath), its New York counsel, advice concerning Federal income tax deductions. Cravath advised petitioner that the proposal to fund an endowment would afford petitioner a "good shot at getting the deduction" as long as the transaction were structured so that the commitment to adopt the program preceded both the motion to reduce the fine and the ultimate payment of the fine. Petitioner also asked Cravath to render advice on the question of the taxation of private foundations as applicable to the proposed plan to fund an endowment. On December 23, 1976, petitioner's board of directors was presented with opinions of its general counsel and of Wilmer, Cutler & Pickering that the authorization of a voluntary relief program by the board would be a valid corporate action under applicable law. That general counsel opinion also stated that "For the purposes hereof, it is assumed that there *264 can be no assurance that [the sentencing judge] will reduce the fine of $ 13.24 million, and there is no assurance that the sums expended for the proposed program will be tax-deductible." In Pickering's December 17, 1976, letter to Forrow, Pickering recommended implementing the proposals without regard to the possibility that the sentencing judge would reduce the fine. In support of this recommendation, Pickering stated: Indeed, there are sound reasons for concluding that it is prudent to proceed without regard to such possibilities in view of [the sentencing judge's] remarks at the time he imposed the fine -- e.g., his statements that he would consider actions which "have been voluntarily taken by" Allied Chemical and are "not of a nature to reduce any legal liability for which it may conceivably be bound."
Between October 1976 and January 1977, the attorneys for both petitioner and the United States Attorney's office separately had contacts with the sentencing judge at various times. Petitioner's counsel had a number of conversations with the judge "to try to plumb the depths of his thinking on what he meant when he said he wanted to see these monies used for the *265 good of the people of the Commonwealth * * *." As a result of these conversations, petitioner proposed establishing what came to be called the Virginia Environmental Endowment Fund. On November 24, 1976, petitioner's criminal attorneys, Spivey and Janus, "visited [the sentencing judge] in his chambers * * * [to] plumb his thinking on the type of action that Allied Chemical could take that would induce him to reduce the fine." In a November 30, 1976, letter to Futter relating some details of this meeting, Spivey stated that "Murray [Janus] * * * suggested that we might set up a foundation with some of the members appointed by [the judge]. This seemed to be the only thing that interested him and he said that this might be a good idea. Other than this, which was not very much, we got no reading from him." The letter also described that morning's phone conversation between Spivey and Cummings: [Cummings] wanted to know if we were working on some sort of plan that could be presented to the Judge in an effort to persuade him to reduce the fine. I told him that we were and inquired if he had any idea about what the Judge had in mind for us. He said that he had several conversations *266 with [the sentencing judge] but found him very difficult to read and really did not know what [the sentencing judge] proposed for us to do.
On December 16, 1976, the sentencing judge met with Virginia Attorney General Andrew Miller (Miller), Cummings, Janus, Spivey, and representatives from the District Attorney's office and the Attorney General's office. In a memorandum to Trowbridge, Spivey related that the judge believed that "it was his unalterable position in this case that if Allied Chemical came up with a voluntary plan 'to help the environment,' he would consider this in ruling on a Rule 35 motion but, he emphasized, he would not reduce the fine for 'payment of any legal liability'" (underscoring in original). Spivey further related, however, that during this meeting, the judge indicated "that what he had in mind was for Allied to spend 5 million dollars 'for the good of the people,' and that the fine would then be reduced by that amount. He quickly added, however, that this was just his 'rough thinking'" (underscoring in original). On December 20, 1976, the sentencing judge met with Spivey for approximately one and a quarter hours. The topic of conversation *267 was petitioner's criminal fine. In a memorandum to Forrow, dated December 20, 1976, Spivey reported: We were in Court in a discovery dispute in [an unrelated case]. [The sentencing judge] asked that I remain to talk about "another matter." As expected it was the fine in USA v. Allied Chemical. At the outset of our conversation the Judge said that the remarks he was about to make were of the sort that he would make only to "Murray [Janus] and you." I asked if he objected to my keeping notes and he said "no" but thought that it best be kept in confidence. As appears, the Judge has modified his thinking since last week. The crux of the conversation was this: the Court will look favorably on a motion to reduce the fine if Allied will establish a charitable trust, that will be independent of the Commonwealth of Virginia, the purpose of which will be to help the environment generally. (Underscoring in original).
Spivey further stated that the judge suggested that Allied Chemical seek a favorable ruling from the Internal Revenue Service regarding the charitable status of the trust. Concerning the relationship between the contribution to the trust and the amount *268 of the criminal fine, Spivey further reported: I said that I had previously understood that he wanted us to pay 5 million and commit to pay another 8 million before we argued the motion. He said that he did not expect us to do this. Seeking further clarification, I asked if he then expected us to spend 13.24 million and he said he did: 8 million with the trust and 5 million to the U.S. Government as the fine. Once we argue the motion and represent that we are going to pay an additional 8 million, he would expect this payment to be made within 10 days.
On January 13, 1977, Janus met with the sentencing judge in the judge's chambers. The meeting was at the request of Janus. Upon returning from the meeting, Janus telephoned Trowbridge to relate the following details of the conversation: [3]
I went in and he said, "What's the problem?" I said, "Judge, Andrew P. Miller, the Attorney General of the Commonwealth of Virginia, has resigned effective January 17th and he is trying to squeeze in the last few days everything he can to his political advantage." He said, "I told you that I knew it was coming." "He is really pressuring Mr. Trowbridge who met with him yesterday and *269 he views this $ 13.24 million dollars as his money." [The sentencing judge] said, "I know that." "It is just so much money. I know how I am reading you." He said, "You're absolutely right." I said, "Let me repeat. We are putting up --" [The judge] said, "You are putting up an endowment of what?" I said, "8 Million." He said, "Good." He never mentioned that figure. He said, "I am to name the trustees." I said, "Fine". * * * "Miller thinks he is using his leverage, that he has got to get up in open court and say it was for non-recoverable costs." [The judge] said, "He doesn't have to say anything. That was my thought before, but as you know I have changed it." I said, "Suppose he gets up and opposes it?" He said, "Let him oppose it in open court. I don't care. We are doing it my way." "Fine, Judge." He said, "Whatever settlement you make with the state, you want to give them money, before or later, go right ahead. You are not getting credit for it with me. You are only getting credit my way." * * * I said, "* * * What about the logistics? Do you want to have the hearing before February 1st when the fine is payable?" He said, "Any time you want it is fine. I may take *270 it under advisement." I said, "Okay." The next point will explain that. He didn't say how long. He said, "Whenever you can get a hearing." I said, "Well, how long can you keep the money? You can keep the money in the registry of your Court. That is payable February 1st." He said, "Yes, but the rule is I am to deliver it forthwith," so it is an interpretation of forthwith. I said, "I don't want to lose track of the money. What do you think of this? At the time we file the Rule 35 Motion, file a motion to suspend execution of the fine until such a time as you rule on the Motion." He said, "Fine," which means we are keeping the money. We are not physically delivering the check, which is beautiful. So it means as long as it is under advisement, it is earning interest for us. If for no other reason it is easier to get it back. At one point he said, "Are you going to put $ 8 million in it?" I said, "Yes, we are prepared to go to $ 8 million." He said, "You put your $ 8 million plus in there and I will suspend $ 8 million." You never said plus but he might be covering his tracks of not giving you dollar for dollar credit. He then said, "How much was the fine again?" I said, *271 "$ 13.24 million." He said, "I knew it was $ 13 plus. I didn't know exactly what" and then he sort of smiled and he said, "Tell you what I'll do, Mur, I may even give you a bonus and save you the addition .24 million dollars" which would mean we put up $ 8 million and he would suspend $ 8.24 million which would make it a nice even round figure of $ 5 million for the fine. I commented that would be a round figure, $ 5 million, is a nice round figure. You will, of course, recall that we dwelled over his sentencing statement word-by-word. He doesn't recall what he said, Sandy, he was shooting from the hip. We are weighing each word like it is manna from Olympus and he doesn't remember what he said. * * * * * * We are on sensitive ground. It is just a relationship we have. Undoubtedly he knows I am telling you, my people, what to do. They are not putting up $ 8 million on my good looks, but at the same time, the state, he says, he is not concerned if they want to oppose it. * * * If we accomplish nothing with the state, then we would have done a tremendous good in my opinion just with the reduction of the fine and tax breaks and what have you. (Emphasis supplied.)
*272 In January 1977, petitioner reached a decision (1) to create an independent entity, the Virginia Environmental Endowment Fund (the Endowment), the broad purposes of which would be to alleviate the effects of Kepone on the environment and the lives of affected persons and generally to improve and enhance the quality of the environment in Virginia, and (2) to transfer $ 8,000,000 to the Endowment. The directors of the Endowment were to be designated by the sentencing judge. The idea of such an endowment was discussed with Cummings, the sentencing judge, and representatives of the Commonwealth of Virginia. However, any discussions with Cummings occurred after the Endowment was established. The Endowment was structured as a section 501(c)(4) organization rather than a section 501(c)(3) organization. Thus, petitioner is claiming that its payment to the Endowment qualifies as a section 162(a) ordinary and necessary business expense and not as a section 170 charitable contribution. Prior to reaching its decision to create the Endowment, petitioner received Federal tax advice from Cravath concerning the structure of the organization for tax purposes. This advice was implemented by *273 the law firm of Hunton & Williams, petitioner's Richmond, Virginia law firm. On January 27, 1977, petitioner's board of directors acted to establish the Endowment. Immediately following this board meeting, Connor and Trowbridge telephoned Governor Godwin and informed him of the board's actions. On January 28, 1977, petitioner issued a press release describing its actions with respect to the Endowment. On Friday, January 28, 1977, petitioner filed a motion to reduce the $ 13,240,000 fine to $ 1,483,000, the minimum provided by law. The court ordered suspension of payment of petitioner's fine until further order of the court and deferred action on the motion to reduce the fine until February 1, 1977, in order to provide the United States Attorney with an opportunity to respond to petitioner's motion. While Cummings had expected that petitioner would present some plan in support of its motion to reduce the fine, he learned about the Endowment for the first time when petitioner presented that motion in court on January 28, 1977. At the February 1, 1977, proceeding, Cummings, on behalf of the Department of Justice, opposed the motion to reduce the fine, arguing that petitioner would *274 probably try to claim a tax deduction for the payment to the Endowment and thus effectively further reduce the fine and lessen its intended penal and deterrent purpose. After taking into account petitioner's motion and affidavits, the presentencing probation report, objections raised by the United States Attorney, and other factors, the court modified petitioner's sentence. The sentencing judge set fines for counts 741 through 940 at $ 25,000 per count, for a total of $ 5,000,000, and eliminated any fine with respect to counts 1 through 740. Instead, the court sentenced petitioner to five years' probation on these 740 counts. No part of the fine was actually paid to the United States District Court until after this modification of the sentence and after this reduction of the fine from $ 13,240,000 to $ 5,000,000. On February 1, 1977, the legal organization of the Endowment was completed. On February 2, 1977, petitioner transferred $ 8,000,000 to the Endowment. Since its inception, the Endowment has used the funds provided by petitioner and others to alleviate the effects of Kepone, primarily through scientific research on health and environmental issues, to improve the quality *275 of the environment in Virginia, and to fund programs related to water quality in the Kanawha and Ohio River valleys. In October 1977, petitioner settled for $ 5,250,000 all of the claims of the Commonwealth of Virginia and the City of Hopewell for Kepone-related costs that they had incurred and the penalties assessed by the Virginia Water Control Board. The settlement covered damages to the City of Hopewell's waste treatment system as well as the expenses borne by the Commonwealth with regard to the Kepone incident. For Federal income tax purposes, petitioner treated the $ 5,250,000 payment as a deductible expense under section 162(a) of the Code. Respondent has agreed with this treatment. On its 1977 Federal income tax return, petitioner deducted the $ 8,000,000 that it transferred to the Virginia Environmental Endowment Fund as an ordinary and necessary business expense under section 162(a). On that same return, petitioner also deducted $ 49,323 that it paid in legal expenses relating to the organization of and contribution to the Endowment. Respondent disallowed both deductions on the ground that they are nondeductible as fines or similar penalties under section 162(f). *276 OPINION Payment to the Endowment
Section 162(a) provides: "There shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business * * *." As an exception to this general rule, however, section 162(f) provides: "No deduction shall be allowed under subsection (a) for any fine or similar penalty paid to a government for the violation of any law." Our initial inquiry focuses on whether the $ 8 million that petitioner paid to set up the Virginia Environmental Endowment Fund is a "fine or similar penalty" within the meaning of this exception. Section 1.162-21(b), Income Tax Regs., provides: (1) For purposes of this section a fine or similar penalty includes an amount -- (i) Paid pursuant to conviction or a plea of guilty or nolo contendere for a crime (felony or misdemeanor) in a criminal proceeding; * * * (iii) Paid in settlement of the taxpayer's actual or potential liability for a fine or penalty (civil or criminal); or * * *
(2) The amount of a fine or penalty does not include legal fees and related expenses paid or incurred in the defense of a prosecution or civil action arising *277 from a violation of the law imposing the fine or civil penalty * * *.
Petitioner argues that the $ 8 million payment was not a fine or similar penalty because (1) the payment was voluntarily made and (2) the payment did not serve to punish or deter the payer. In Waldman v. Commissioner, 88 T.C. 1384 (1987), affd. without published opinion 850 F.2d 611 (9th Cir. 1988), we addressed the issue of what constituted a "fine or similar penalty" within the meaning of section 162(f). The taxpayer in that case was charged with 29 counts of conspiracy to commit grand theft in violation of California law. He pled guilty to one of the counts and the remaining 28 counts were dismissed. The taxpayer was sentenced to 1 to 10 years in prison, but the State court stayed execution of the sentence on condition that he pay certain amounts of restitution to his victims. In Waldman the taxpayer paid $ 28,500 in restitution and attempted to deduct this amount on his Federal income tax return as a legal or professional fee. Relying on section 1.162-21(b)(1)(i), Income Tax Regs., this Court found that the taxpayer's restitution payment was made pursuant to *278 his plea of guilty. "The [State] court stayed execution of his sentence on condition that he pay specified amounts of restitution to his victims. Clearly, had [the taxpayer] pled not guilty, and had he been subsequently acquitted, the court could not have ordered payment of restitution." Waldman v. Commissioner, 88 T.C. at 1387. In this case petitioner argues on brief that the common thread running through the section 162(f) cases is that the expenditure must have been "an involuntary payment ordered or directed by a court" (emphasis in original). See, e.g., Bailey v. Commissioner, 756 F.2d 44, 46 (6th Cir. 1985), affg. an order of this Court (state court allowed the taxpayer's civil fine to be applied as settlement in class action); Stephens v. Commissioner, 93 T.C. 108, 109 (1989), revd. 905 F.2d 667 (2d Cir. 1990) (taxpayer placed on probation on condition that he make restitution payment); Waldman v. Commissioner, 88 T.C. at 1386 (execution of sentence stayed on condition that the taxpayer pay restitution to his victims). We accept petitioner's characterization of a "fine or *279 similar penalty" as an involuntary payment. We do not, however, accept petitioner's characterization of its $ 8 million payment to the Endowment as being voluntary. Petitioner has not cited, and we have not found, any cases in the section 162(f) area defining "voluntary" for these purposes. We think that at the very least a "voluntary" payment must be one made without expectation of a quid pro quo from the court. Recognizing that the payment in question could not qualify as a charitable contribution because the Endowment was not organized and operated as a qualified charitable organization, we nonetheless turn to the area of charitable contributions under section 170 for the limited purpose of finding a meaningful interpretation of "voluntary". Thus, for the purpose of section 162(f), we define a "voluntary" payment as one made without the expectation of a quid pro quo. See, e.g., Graham v. Commissioner, 83 T.C. 575, 580-581 (1984), affd. 822 F.2d 844 (9th Cir. 1987), affd. 490 U.S. 680 (1989) (citing Haak v. United States, 451 F. Supp. 1087, 1090-1091 (W.D. Mich. 1978) ("where contributions are made with *280 the expectation of receiving a benefit, and such benefit is received, the transfer is not a charitable contribution, but rather a quid pro quo.")). See also Neher v. Commissioner, 852 F.2d 848, 852 (6th Cir. 1988), vacated on other grounds 882 F.2d 217 (6th Cir. 1989) (adopting the objective standard of other circuits that the issue is "whether the payment was a voluntary transfer made without consideration, or a payment made with the expectation of receiving a commensurate benefit in return.") In the present case, petitioner made the $ 8 million payment to the Endowment with the virtual guarantee that the sentencing judge would reduce the criminal fine by at least that amount. Petitioner's characterization of this payment as "voluntary" is simply not borne out by the record as a whole. Petitioner's associate director of taxes, Monck, in October 1976 advised petitioner to structure the payment so that the trial court would look at it as voluntary. It was clear from the beginning, however, that the purpose of the payment was mitigation of petitioner's criminal sentence -- i.e., that it was to be made with the expectation of getting something *281 in return. Notwithstanding Monck's advice and similar advice from Wilmer, Cutler & Pickering, the conversations between petitioner's defense counsel and the sentencing judge in December 1976 and January 1977 were intended to and did make it quite clear to petitioner that an $ 8 million payment to the Endowment would result in an $ 8 million reduction in petitioner's $ 13 million fine. And as the sentencing judge told Janus, he even gave petitioner a bonus of the $ 240,000 amount, the original fine having been set at $ 13,240,000. Under these circumstances, we cannot find that the $ 8 million contribution to the Endowment was "voluntary". Petitioner's next contention is that, in order to be a fine, the payment must serve to punish or deter the payer. Citing section 1.162-21(b)(2), Income Tax Regs., petitioner stated that "Payments that are compensatory in nature or otherwise serve remedial purposes are not fines or similar penalties, even if they are made to a government." That regulation states: "Compensatory damages * * * paid to a government do not constitute a fine or penalty." In Waldman, we reasoned that the taxpayer would not have prevailed even if the restitution *282 payment were analogized to a civil penalty. We have held that section 162(f) disallows deduction of civil penalties "imposed for purposes of enforcing the law and as punishment for the violation thereof," and we have also held that some civil payments, although labeled "penalties," remain deductible if "imposed to encourage prompt compliance with a requirement of the law or as a remedial measure to compensate another party." * * * Where a payment ultimately serves each of these purposes, i.e., law enforcement (nondeductible) and compensation (deductible), our task is to determine which purpose the payment was designed to serve.
Waldman v. Commissioner, 88 T.C. at 1387 (citations omitted). Here we conclude that the payment served a law enforcement purpose rather than a compensatory purpose. Where, as in this case, the trial judge's statements indicate that there may be a dual purpose for the payment, we must determine which purpose the payments in question were designed to serve. S & B Restaurant, Inc. v. Commissioner, 73 T.C. 1226, 1232 (1980) (citing Middle Atlantic Distributors v. Commissioner, 72 T.C. 1136, 1145 (1979); *283 Grossman & Sons, Inc. v. Commissioner, 48 T.C. 15, 31 (1967)). At the October 5, 1976, sentencing hearing, the judge was explicit in his desire to punish petitioner and to deter both petitioner and other industrial corporations from further pollution. He imposed sentence taking into account that "Allied knew it was polluting the waters" and that the company would have been found guilty had there been a trial on the first indictment. The trial judge further stated: "I hope after this sentence, that every corporate official, every corporate employee that has any reason to think that pollution is going on, will think, 'If I don't do something about it now, I am apt to be out of a job tomorrow.' I want the officials to be concerned when they see it." The trial judge, however, also made remarks that may have indicated that the payments were to be made for the purpose of compensating victims of the Kepone incident. At the October 5, 1976, hearing, the judge indicated that he wanted the people of Virginia to benefit from the imposition of the criminal fines. The judge further stated that at the Rule 35 hearing he "intended to and [would] consider what actions, if *284 any, have been voluntarily taken by the defendant corporation to alleviate the horrendous effects that have occurred." On the other hand, the sentencing judge also cautioned petitioner to take actions that were "not of a nature to reduce any legal liability for which it may conceivably be bound." On these facts, we conclude that if there were a compensatory or remedial purpose for the payment, it was minimal. The payment was for punishment and deterrence of environmental crimes. Petitioner next argues that the $ 8 million payment was not ordered by the sentencing judge as part of petitioner's sentence or imposed as a condition for reduction of sentence and, therefore, section 162(f) is inapplicable. As shown in the Findings of Fact, petitioner obtained assurances from the sentencing judge that its "voluntary" contribution to the Endowment would be "credited" against the fine that was imposed at the original sentencing hearing. The sentencing judge was aware that he could not direct that the criminal fine be utilized for the benefit of the people of Virginia. Nonetheless, the judge's primary consideration was that the entire amount of the fine not go into the Federal coffers, *285 and that at least a portion inure to the benefit of the citizens of the Commonwealth of Virginia. While the judge could not legally earmark the $ 13.24 million fine for the benefit of the citizenry of Virginia, petitioner and the judge carefully crafted a transaction that would allow a portion of the criminal fine to remain in Virginia but not be controlled by the Commonwealth of Virginia. Instead that $ 8 million was to be placed into the Virginia Environmental Endowment Fund, whose directors were appointed by the sentencing judge. But this transaction had another consequence. It took petitioner out of the literal language of section 162(f) and provided petitioner with an arguable basis for claiming a deduction for an ordinary and necessary business expense. While the form of the payment does not necessarily fit within the letter of section 162(f), in substance petitioner paid a criminal fine. The contribution to the Endowment had the collateral effect of being a mere device to obtain a tax deduction for an amount not otherwise deductible under the Internal Revenue Code. To allow petitioner a deduction in this case "would be to exalt artifice above reality and to deprive the *286 statutory provision in question of all serious purpose". Gregory v. Helvering, 293 U.S. 465, 470 (1935). In Waldman, we addressed the issue of when a taxpayer's "fine or similar penalty" was "paid to a government." As stated therein, "We do not believe that a Government must actually 'pocket' the fine or penalty to satisfy the 'paid to a government' requirement of section 162(f)." Waldman v. Commissioner, 88 T.C. at 1389. One of the sentencing judge's goals in sentencing petitioner was to ensure that the citizens of the Commonwealth of Virginia received or benefited from a portion of the criminal fine. The fact that the payment at issue in this case was made to the Endowment does not change our result. We hold that the payment by petitioner to the Endowment was in substance a "fine or similar penalty" within the meaning of section 162(f). Legal Expenses
As noted above, section 1.162-21(b), Income Tax Regs., provides: (2) The amount of a fine or penalty does not include legal fees and related expenses paid or incurred in the defense of a prosecution or civil action arising from a violation of the law imposing the fine or *287 civil penalty * * *.
Because we have held that the amount paid to the Endowment was in substance a criminal fine, the legal expenses were "incurred in the defense of a prosecution" and are not within the purview of section 162(f). Therefore, the expenses are ordinary and necessary expenses of carrying on a trade or business, and thus we hold they are deductible under section 162(a). In Commissioner v. Tellier, 383 U.S. 687, 688 (1966), the Supreme Court addressed the issue of "whether expenses incurred by a taxpayer in the unsuccessful defense of a criminal prosecution may qualify for deduction from taxable income under § 162(a) * * *." Tellier was in the business of underwriting the public sale of stock offerings and purchasing securities for resale to customers. He was indicted on charges of securities fraud, mail fraud, and conspiracy, and he incurred over $ 22,000 in legal expenses in the unsuccessful defense of this criminal prosecution. Commissioner v. Tellier, 383 U.S. at 688. Applying the "origin and character of the claim" test established in United States v. Gilmore, 372 U.S. 39 (1963), the Supreme Court *288 found that the legal expenses clearly qualified as expenses paid or incurred in carrying on a trade or business within the meaning of section 162(a). Commissioner v. Tellier, supra at 689. The Commissioner, conceding that Tellier's legal fees qualified as ordinary and necessary expenses within the meaning of section 162(a), argued that a deduction for these legal fees should be disallowed on the ground of public policy. Commissioner v. Tellier, supra at 689, 690. The Supreme Court expressed its approval of the public policy exception for fines and penalties (Tellier was decided before the enactment of section 162(f)), but noted that "No public policy is offended when a man faced with serious criminal charges employs a lawyer to help in his defense. That is not 'proscribed conduct.' It is his constitutional right." Commissioner v. Tellier, supra at 694 (citing Chandler v. Fretag, 348 U.S. 3 (1954)). In 1969, the Congress codified the public policy exception for "fines and similar penalties" in section 162(f). Sec. 903, Tax Reform Act of 1969, Pub. L. 91-172, sec. 902, 83 Stat. 487. *289 "The provision for the denial of the deduction for payments in these situations which are deemed to violate public policy is intended to be all inclusive. Public policy, in other circumstances, generally is not sufficiently clearly defined to justify the disallowance of deductions." S. Rept. 91-552 (1969), 1969-3 C.B. 423, 597. As in Tellier, the regulations promulgated under section 162(f) do not treat legal fees and expenses as a fine or penalty. Sec. 1.162-21(b)(2), Income Tax Regs.
Applying the reasoning in Commissioner v. Tellier, supra, we hold that the expenses incurred in creating the Endowment, being part and parcel of the criminal proceedings, are deductible under section 162(a). To reflect the concessions and the above holdings, Decisions will be entered under Rule 155. Footnotes
1. Count 941, the conspiracy charge, had previously been disposed of.↩
2. Rule 35 of the Federal Rules of Criminal Procedure↩, as applicable for offenses committed prior to November 1, 1987, permitted a defendant to move for a reduction of sentence within 120 days after the sentence was imposed.
3. At trial, respondent offered into evidence a transcript of the telephone conversation between Janus and Trowbridge. The telephone conversation was stenographically recorded and the transcript thereof prepared by a member of Janus' staff. The transcript was admitted into evidence without objection.↩